1  E. MARTIN ESTRADA
   United States Attorney
2  MACK E. JENKINS
   Assistant United States Attorney
3  Chief, Criminal Division
   SUSAN S. HAR (Cal. Bar No. 301924)
4  J. JAMARI BUXTON (Cal. Bar No. 342364)
   Assistant United States Attorneys
5  Public Corruption and Civil Rights Section
        1500 United States Courthouse
6       312 North Spring Street
        Los Angeles, California 90012
7       Telephone:    (213) 894-3289
        Facsimile:    (213) 894-0141
8       E-mail:       Susan.Har@usdoj.gov
                      Jamari.Buxton@usdoj.gov
9
   Attorneys for Plaintiff
10 UNITED STATES OF AMERICA

11              UNITED STATES DISTRICT COURT

12         FOR THE CENTRAL DISTRICT OF CALIFORNIA

13 UNITED STATES OF AMERICA,          No. CR 22-009-SB

14              Plaintiff,            GOVERNMENT'S SENTENCING
                                      MEMORANDUM; EXHIBITS A-B
15              v.
                                      [PUBLIC VERSION]
16 THOMAS H. PETERS,
                                      Hearing Date:  May 9, 2023
17              Defendant.            Hearing Time:  8:00 a.m.
                                      Location:      Courtroom of the Hon.
18                                                   Stanley Blumenfeld

19

20         Plaintiff United States of America, by and through its counsel of record, the

21 United States Attorney for the Central District of California and Assistant United States

22 Attorneys Susan S. Har and J. Jamari Buxton, hereby files its sentencing memorandum

23 for defendant Thomas H. Peters.

24

25

26

27

28

This sentencing memorandum is based upon the attached memorandum of points and authorities, supporting exhibits, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: April 25, 2023

Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

_/s/_
SUSAN S. HAR
J. JAMARI BUXTON
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# **TABLE OF CONTENTS**

DESCRIPTION                                                                                                PAGE

TABLE OF AUTHORITIES ..................................................................................... ii

MEMORANDUM OF POINTS AND AUTHORITIES .................................................. 1

I.     INTRODUCTION ................................................................................ 1

II.    STATEMENT OF FACTS OF THE OFFENSE ............................................. 2

    A.    The LADWP Billing Litigation and the City's Failed "Parallel Litigation" Strategy ............................................................. 2

    B.    The City's Collusive Litigation Strategy .................................. 3

    C.    Defendant Fights to Conceal the Collusive Litigation and Learns of an Extortionist Threat to Reveal the Collusive Litigation .......................... 4

    D.    Defendant Repeatedly Aids and Abets Person A's Extortion of Kiesel ....... 5

    E.    Defendant Continues to Conceal the Extortion and Collusion ................... 7

III.   THE GUIDELINES RANGE ................................................................ 8

    A.    USPO's Calculations and Recommendation .......................... 8

    B.    The Government's Calculation .................................... 9

IV.   MOTION FOR DOWNWARD DEPARTURE FOR SUBSTANTIAL ASSISTANCE ..................................................................................... 11

    A.    Defendant's Substantial Assistance ................................... 11

    B.    Timeliness of Assistance and Cost to Defendant .......................... 12

V.    THE GOVERNMENT'S SENTENCING RECOMMENDATION ................... 13

    A.    The Nature and Circumstances of the Offense .......................... 14

    B.    History and Characteristics of Defendant .......................... 14

    C.    Extensive Cooperation with the California State Bar ................... 16

    D.    General and Specific Deterrence ................................... 18

    E.    Need to Reflect Seriousness of Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense ................... 19

    F.    Avoidance of Sentencing Disparities ................................... 20

    G.    Fine ................................................................... 20

VI.   CONCLUSION ................................................................ 21

# TABLE OF AUTHORITIES

Page(s)

Cases

477 F.3d  (7th Cir. 2006) ........................................................................18
United States v. Bistline,
   665 F.3d 758 (6th Cir. 2012) ......................................................15, 16
United States v. Booker,
   543 U.S. 220 (2005) ..............................................................................10
United States v. Martin,
   455 F.3d 1227 (11th Cir. 2006) ..........................................................18
United States v. Morgan,
   635 F. App'x 423 (10th Cir. 2015) ....................................................19
United States v. Musgrave,
   761 F.3d 602 (6th Cir. 2014) ..............................................................19
United States v. Prosperi,
   686 F.3d 32 (1st Cir. 2012) ................................................................15
United States v. Spano,
   411 F. Supp. 2d 923 (N.D. Ill. 2006) ................................................18
United States v. Stefonek,
   179 F.3d 1030 (7th Cir. 1999) ............................................................19
United States v. Treadwell,
   593 F.3d 990 (9th Cir. 2010) ..............................................................19

Statutes

18 U.S.C. § 3553(a)(6) ..............................................................................20
28 U.S.C. § 994(d) ....................................................................................15

Rules

U.S.S.G. § 2B1.1(b)(1)(H) ........................................................................8
U.S.S.G. § 2B3.3(a) ....................................................................................8
U.S.S.G. § 3B1.3 ..................................................................................8, 10
U.S.S.G. § 5E1.2(c)(3) ..............................................................................21
U.S.S.G. § 5K1.1 ..............................................................................passim
U.S.S.G. § 5H1.2 ......................................................................................15
U.S.S.G. § 5H1.5 ......................................................................................15
U.S.S.G. § 5H1.10 ....................................................................................15

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.    INTRODUCTION**

In 2014, the Los Angeles Department of Water and Power ("LADWP") and the City of Los Angeles (the "City") faced a massive crisis.  Following the botched rollout of a new billing system from PricewaterhouseCoopers ("PwC") that caused, in some cases, significant overbilling of City customers, LADWP and the City were hit with multiple class action lawsuits and a public relations nightmare.  In an attempt to quell that crisis, defendant Thomas Peters, the then-Chief of the Civil Litigation Branch of the City Attorney's Office, was part of a secret strategy to conceal the fact that the City effectively sued itself in a "white-knight" lawsuit by using a friendly plaintiff's lawyer hand-selected by the City's then-Special Counsel, Paul Paradis.  This had led to the <u>Jones v. City</u> lawsuit, which went on to become the "white knight" the City desired to resolve the pending actions it faced.  Meanwhile, LADWP and the City filed their own affirmative lawsuit against PwC: <u>City v. PwC</u>, over which defendant was directly responsible.

But in his continued efforts to keep concealed the collusive origins of <u>Jones v. City</u>, defendant's actions turned criminal.  In 2017, defendant learned that a former employee of Paul Kiesel (the City's other Special Counsel) sought to extort Kiesel out of one million dollars under the threat of revealing the collusion that led to <u>Jones v. City</u>.  Defendant then had a choice to make.  He could have chosen to report the extortionist to the authorities.  He could have chosen to admit--to PwC, the judge in <u>City v. PwC</u>, and the public--the truth of how the <u>Jones v. City</u> litigation was collusively forged.  He could have even chosen to do *nothing*.  But defendant rejected each of those paths.  Instead, he doubled down on and added to the extortionist demand <u>by making threats of his own</u>: that defendant would seek to have Kiesel fired if he failed to satisfactorily handle the situation and prevent the public disclosure of the collusive scheme.  By aiding and abetting the extortionist, defendant criminally violated the public trust and chose to save

his own job, reputation, and political prospects—all which would have been irreparably damaged if the collusion had been revealed.

Defendant, the City's head of the civil division and a long-time officer of the court, knew better.  Defendant's years-long concealment of the collusive and extortionist schemes, and abuse of his position and authority as a public official to protect himself, are aggravating.  Were defendant's story to end there, a sentence within the applicable Guidelines range of 41-51 months would be appropriate.

To his great credit, however, defendant's story continued, and it eventually became one of accountability, remorse, and fulsome cooperation.  As explained below, the government moves for a three-level downward departure under U.S.S.G. § 5K1.1, based on defendant's cooperation in the federal criminal investigation.  The government also recommends an additional four-level variance based on defendant's substantial assistance to the State Bar of California, as well as to account for defendant's mitigating personal history and characteristics.  Based on an adjusted total offense level of 15 and resulting Guidelines range of 18-24 months' imprisonment, the government believes a low-end sentence of 18 months' imprisonment is sufficient but not greater than necessary to achieve the goals of sentencing.

Accordingly, the government respectfully recommends the following sentence: **(1) an 18-month term of imprisonment; (2) a three-year term of supervised release; (3) a \$35,000 fine; and (4) a special assessment of \$100.**

## II.     STATEMENT OF FACTS OF THE OFFENSE[1]

### A.     The LADWP Billing Litigation and the City's Failed "Parallel Litigation" Strategy

In 2013, LADWP, the largest municipal utility in the United States, had implemented a new billing system that it procured from an outside vendor, PwC.  As set forth in defendant's Factual Basis, and as widely reported by the press, the

---

[1] Unless otherwise indicated, all facts herein are drawn from the stipulated factual basis in defendant's plea agreement.  (<u>See</u> Dkt. No. 7.)

2

implementation and rollout of that system resulted in massive errors, including by both overcharging and undercharging hundreds of thousands of ratepayers.  By December 2014, LADWP and the City were reeling from a PR nightmare in the wake of the botched billing system and faced multiple class action lawsuits.  The City Attorney's Office—including defendant as the Chief of the Civil Litigation Branch—the City's Class Action Counsel, and the City's Special Counsel (Paul Paradis and Paul Kiesel), represented the City in dealing with the various lawsuits arising from the billing system.

In an effort to turn the negative tide of public opinion away from the City and towards PwC, defendant and the City Attorney's Office originally planned to pursue the so-called "parallel litigation strategy" in January and February 2015.  Under this strategy, the City's Special Counsel would launch two separate lawsuits against PwC: (1) representing a ratepayer, Antwon Jones as a plaintiff in <u>Jones v. PwC</u>, and (2) representing the City as a plaintiff in <u>City v. PwC</u>.  The parallel litigation strategy would also entail convincing counsel for the plaintiffs of the already-pending class action lawsuits to toll and dismiss their claims against the City and to join in on the coordinated litigation against PwC.  For his part as the head of the Civil Litigation Branch, defendant understood that successfully re-directing the litigation firepower and negative public opinion away from the City and placing the City on offensive footing against PwC would enhance his own reputation and professional prospects.  This parallel litigation strategy, however, was ultimately abandoned in late-February 2015 after the City's Class Action Counsel advised against it due to ethical and practical concerns given the potential conflict of interest it would create.

**B.    The City's Collusive Litigation Strategy**

Out of the failed parallel litigation strategy, the collusive litigation approach was born.  The City Attorney's Office still needed a way to shift the spotlight away from LADWP and towards PwC.  Consequently, within a few weeks, a senior City Attorney official directed Paradis and Kiesel to find outside counsel that would be friendly to the City to represent the ratepayer Jones in a suit against the City itself in a "white-knight"

class action lawsuit.  This would ultimately become the <u>Jones v. City</u> lawsuit, filed by Ohio Attorney on April 1, 2015 (with the help of local counsel).[2]  The draft complaint for that lawsuit, however, was actually prepared by the City's counsel, Paradis.  By directing a lawsuit against itself that was not truly adverse, the City's goal was to avoid a long and costly battle in the other <u>bona fide</u>, arms-length class action lawsuits and to use <u>Jones v. City</u> as a vehicle to preclude and settle <u>all</u> claims on the City's desired terms in one fell swoop.

Shortly following the filing of that complaint, defendant became aware of the collusive litigation and the City's complicity in secretly directing <u>Jones v. City</u>.  And by the summer of 2015, the City and Ohio Attorney were in confidential mediation sessions to settle the lawsuit—sessions from which all other class action plaintiffs were excluded. In one settlement proposal, the plaintiff attorneys' fees were to be capped at $13 million. The City's own lawyers—the Class Action Counsel—raised concerns that $13 million was unjustifiably high, particularly when Ohio Attorney had done so little.

On July 20, 2017, the judge overseeing the class actions issued final approval in <u>Jones v. City</u>, including for $19 million in plaintiff attorney's fees, of which $10.3 million went to Ohio Attorney and his law firm.  At no point prior to the final approval of the class action settlement did defendant or anyone else at the City reveal the collusive origins of <u>Jones v. City</u>; indeed, as set forth below, defendant actively fought to keep the collusion concealed, which he believed was necessary so as not the jeopardize the settlement that was secured in <u>Jones v. City</u> and, further, for the success of <u>City v. PwC</u>.

## C.   Defendant Fights to Conceal the Collusive Litigation and Learns of an Extortionist Threat to Reveal the Collusive Litigation

Meanwhile, as planned, the City (represented by Paradis and Kiesel on a contingency-fee basis) initiated its lawsuit against PwC, <u>City v. PwC</u> in March 2015,

---

[2] Paul Paradis ultimately secured a $2,175,000 kickback from Ohio Attorney for this arrangement.  See <u>United States v. Paul Paradis</u>, CR 21-540-SB, Dkt. No. 6 [Plea Agreement] at 30.  Defendant was not aware of this kickback.

over which defendant was directly responsible.  (See Exhibit A [Search Warrant Application for Case No. ▮▮▮▮▮▮▮] at 81.)  The City Attorney officially and publicly took the position that PwC had caused the City to sustain "perhaps hundreds of millions of dollars" in damages.

By early 2017, PwC had learned of Paradis' draft of the Jones v. City complaint and sought a court order to compel its production in City v. PwC.  Defendant knew that this production would reveal the collusive origins of the Jones v. City case, which he and the City had kept concealed for years.  Accordingly, defendant and others on behalf of the City vigorously fought the production of this document.  After months of contentious litigation, the court set a hearing on PwC's motion to compel for December 4, 2017.

Less than one month before the December 4 hearing, defendant learned that a former employee of Kiesel ("Person A") had documents that would demonstrate the collusive origins of Jones v. City that defendant and the City were actively trying to keep hidden.  Defendant further learned that Person A was threatening to reveal this information unless Kiesel paid her over a million dollars and that Person A had specifically threatened to appear at the December 4 hearing in the City v. PwC matter.

**D.    Defendant Repeatedly Aids and Abets Person A's Extortion of Kiesel**

Upon learning of Person A's extortionist demand, defendant met with Kiesel and Paradis on November 17, 2017.  Defendant directed Kiesel to resolve the situation, including by paying Person A the monetary demand if necessary.  Defendant threatened that if Kiesel failed to do so, he (the head of the Civil Litigation Branch and person directly overseeing City v. PwC) would advocate to have Kiesel fired as the City's Special Counsel.  Defendant's threat to seek Kiesel's termination amounted to a potential loss of millions of dollars for Kiesel.  By that point, Kiesel had been working as Special Counsel on City v. PwC for over 2.5 years under a contingency-fee contract.  (Ex. A at 81.)  Kiesel had spent approximately a quarter million dollars of his own money on costs associated with the case and, given the City's claim against PwC seeking hundreds of millions of dollars, Kiesel stood to earn millions if the City prevailed.  (Id.; see also Dkt.

5

No. 1 [Information] ¶ 9.)  Moreover, defendant's threat to have the City Attorney fire Kiesel in the middle of a high-stakes, public lawsuit meant Kiesel would suffer economic and reputational harm.

On November 29, 2017, defendant met with Kiesel again, who expressed to defendant that he was worried about defendant's threat to have him fired as Special Counsel and described his efforts to negotiate with Person A.  Defendant told Kiesel he would not be fired for now, but that Kiesel needed to ensure Person A did not carry out her threat of disclosure.  In so instructing Kiesel, defendant meant that Kiesel needed to get back the documents from Person A, even if it meant paying her.

On December 1, 2017 (three days before the December 4 hearing), defendant gave an update of Person A's extortionist threats to senior members of the City Attorney's Office.  Following that meeting, defendant sent a text message to Paradis indicating that the City had not made a decision about terminating the Special Counsel contract, but warned of the City's concern of a "sideshow" at the December 4 hearing if Person A appeared to reveal the documents showing the collusion.

On December 4, Person A attended the hearing as she had threatened.  Defendant watched as she unsuccessfully attempted to provide documents to a court employee. Person A then approached the lead attorney for PwC and exchanged business cards with him.  Defendant understood that by these actions, Person A was conveying that she was serious about revealing the City's collusion unless her monetary demands were met.

Faced with the very real threat of Person A's disclosure, defendant again doubled down on his efforts to get Kiesel to silence Person A.  Defendant sent a series of text messages to Kiesel following the hearing, including by telling him, "I need you to take care of this."  That same day, defendant met with Kiesel and others, where he reiterated his threat: satisfy Person A's demands and secure the return of the documents or Kiesel would be fired.  Based on defendant's threat, Kiesel stated he would "get this done."

Later that same evening, Kiesel had a text message exchange with defendant to convey that Kiesel had done as defendant instructed: Kiesel had agreed to pay Person A

6

$800,000 for the return of the documents.  In response, defendant stated, "Good job" and further instructed Kiesel to obtain a strong confidentiality agreement with Person A regarding their deal for the payment in order to keep it concealed.

Through these acts, defendant committed extortion.  He threatened Kiesel with certain economic and reputational harm, including the potential loss of millions of dollars through the termination of his Special Counsel contract if he did not secure Person A's silence.  And because of defendant's high-ranking position at the City Attorney's Office, this was a threat he had the power to make a reality.  Through this directive, defendant intended to convey that Kiesel was to do what was necessary, including through the payment of nearly $1 million.  Defendant committed this crime because he feared that if the collusive origins of Jones v. City were revealed, it would impact the reputation of the City Attorney's Office and imperil both the Jones v. City settlement and recovery in City v. PwC; defendant also feared that he would personally be blamed for the fallout and that he would lose his Branch Chief position and future employment prospects.

### E.    Defendant Continues to Conceal the Extortion and Collusion

Indeed, defendant's commitment to keeping concealed both the extortion scheme and the underlying collusion continued well after he left the City.  In May 2019, and while PwC was conducting depositions of City employees (including of defendant) regarding the collusion, the City inquired with defendant what he recalled about Kiesel's settlement with Person A.  Defendant understood the point of the City's true inquiry to be whether defendant, if asked, would keep concealed the extortion and the underlying collusion.  In order to message that defendant was in fact still committed to keeping these facts concealed to protect himself and the City, defendant falsely and misleadingly indicated to the City that the dispute involved only Person A's employment claim (and not anything about the collusive litigation scheme).

## III.   THE GUIDELINES RANGE

### A.   USPO's Calculations and Recommendation

On June 28, 2022, the United States Probation Office ("USPO") issued the presentence investigation report ("PSR"), along with a disclosed recommendation letter. (Dkt. Nos. 24, 25 ["PSR"].)  The PSR found that the following sentencing Guidelines factors applied:

| | | | |
|---|---|---|---|
| Base Offense Level: | 9 | [U.S.S.G. § 2B3.3(a)] |
| Value of amount over $550.000 | +14 | [U.S.S.G. § 2B1.1(b)(1)(H)] |
| Abuse Position of Trust | +2 | [U.S.S.G. § 3B1.3] |
| Acceptance of responsibility | - 3 | [U.S.S.G. § 3E1.1] |
| **Total Offense Level** | **22** | |

(PSR ¶¶ 54-65.)  The PSR indicated that defendant had no criminal history points, yielding a score of zero and a criminal history category of I.  (Id. ¶¶ 71-72.)  Based on the foregoing, USPO calculated defendant's resulting advisory sentencing Guidelines range as **41-51 months**.[3]  (Id. ¶ 134.)

The USPO's letter, which does not address any of defendant's cooperation with the USAO or the State Bar, recommended a low-end sentence of 41 months' imprisonment.  (Dkt. No. 24 at 1.)  The letter briefly summarized defendant's criminal conduct, pointing out that the matter was "serious in that Peters used his position as a high-ranking city official to exert pressure on Kiesel to pay an alleged extortionist" and that he did so in order to "cover up previous collusive, and unethical, if not illegal, behavior."  (Id. at 6.)  The letter also notes that when defendant threatened to fire Kiesel from his role as Special Counsel if he did not "get this done," that threat meant Kiesel

---

[3] In what appears to be an inadvertent error, USPO's recommendation letter (Dkt. No. 24) states on page 6 that the applicable Guidelines range is 33 to 41 months, but correctly states on page 1 that the range is 41 to 51 months, consistent with its calculations in the PSR.

1    would not have recouped any of the significant costs he had expended over years of

2    litigation.  (Id. at 4.)  In mitigation, USPO described defendant's "low risk for

3    recidivism," his community service work, and the likely loss of his law license.  (Id. at

4    6.)  USPO also opined that the 14-level increase for the amount of the extortion "may

5    overstate Peters' involvement" because he did not "directly financially benefit from the

6    extortion" and "did not take part in the extortion negotiations," but did not apply any

7    departure or variance.  (Id.; see also PSR ¶ 149.)

8         **B.    The Government's Calculation**

9         The government concurs with the PSR's initial calculation of the Guidelines prior

10   to any consideration of a departure or variance for defendant's substantial assistance

11   with the USAO and the State Bar.  The government addresses two of the Guidelines

12   enhancements in more detail below.

13        ***Value of Extortion Amount.***  Although USPO did not ultimately recommend any

14   variance based on its described mitigation relative to the value of the extortion amount

15   (see Dkt. No. 24 at 6; PSR ¶ 149), the government disagrees with the characterization

16   that the 14-level enhancement for the amount of the extortion overstates the seriousness

17   of the offense.  To the contrary, that enhancement is based on the lower amount of the

18   money Kiesel paid to Person A, and does not reflect the higher value of economic and

19   reputational loss that defendant effectively threatened when defendant stated Kiesel

20   would be fired from the Special Counsel role.  Indeed, even when defendant understood

21   and believed Person A's demand to be over one million dollars (see Dkt. No. 7,

22   Attachment A ¶ 16), he directed Kiesel to resolve the situation, including by paying that

23   demand.  Nor does the government view the lack of a "direct financial benefit" to

24   defendant as accurate or mitigating.  In committing the extortion, defendant sought to

25   preserve his job, his future career, his reputation, the reputation of the City Attorney's

26   Office, and two, years-long, high-stakes and high-profile lawsuits for the City—things

27   that defendant surely valued far more than a short-term monetary payout.

28

1
2
3
4
5

   ***Abuse of Position of Trust.***  The government concurs with the USPO that the additional two-level enhancement pursuant to U.S.S.G. § 3B1.3 for abuse of position of trust applies.  This enhancement applies if the defendant abused a position of public trust "in a manner that significantly facilitated the commission or concealment of the offense."  U.S.S.G. § 3B1.3.

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

   Here, defendant abused a position of public trust—the Chief of the Civil Litigation Branch directly responsible for the <u>City v. PwC</u> matter—"in a manner that significantly facilitated the commission of the offense."  It was only because defendant held the role that he did that he was able to make the specific extortionate threat against Kiesel (and get results): that he would advocate for Kiesel to be fired from his role as Special Counsel for the City in <u>City v. PwC</u> if Kiesel did not pay Person A's demand.  Nor does it make a difference that defendant could not unilaterally terminate Kiesel's contract.  As the head of the civil branch of the City Attorney's Office responsible for the precise lawsuit for which Kiesel was Special Counsel, defendant had the clout and influence to do what he threatened, and, as Kiesel expressed to defendant, it was <u>defendant's</u> threat that Kiesel took seriously.   Had the same threat to fire Kiesel come from, hypothetically, a line attorney at the City Attorney's Office, it surely would not have shared the ominous weight that it did when made by defendant.  This was an abuse of defendant's position of public trust.  Defendant's abuse of trust is not otherwise captured in the base offense level, which generally applies to all acts of extortion, or in the value of the extortion.

21
22
23
24
25
26

   Accordingly, the government concurs with USPO's <u>initial</u> calculation of a total offense level of 22 and criminal history category of I.  As explained below, however, the government respectfully recommends a 3-level departure for defendant's substantial assistance in the federal criminal investigation, as well as an additional 4-level <u>Booker</u>[4] variance based on defendant's extensive cooperation with the State Bar and other mitigating factors.

27
28

---

[4] <u>United States v. Booker</u>, 543 U.S. 220 (2005).

10

After the government's recommended collective 7-level departure and variance, the adjusted **total offense level is 15, resulting in a Guidelines range of 18-24 months**. As explained below, the government recommends a sentence at the low-end of that adjusted range; that is, **18 months'** imprisonment.

IV.   **MOTION FOR DOWNWARD DEPARTURE FOR SUBSTANTIAL ASSISTANCE**





## V.    THE GOVERNMENT'S SENTENCING RECOMMENDATION

The government's recommended sentence of 18 months' imprisonment is sufficient, but no greater than necessary, to achieve the goals of sentencing.  An 18-month term of imprisonment is a meaningful custodial sentence that accounts for the seriousness of defendant's crime, furthers the need for deterrence, promotes respect for the law, and provides just punishment.  At the same time, the recommended sentence, which reflects a collective 7-level departure and variance from the otherwise applicable Guidelines, appropriately acknowledges and rewards defendant's substantial cooperation with the government and the State Bar, and accounts for mitigation in his personal history and characteristics.

---

[7] Defendant's cooperation with the State Bar, which the government believes is an appropriate basis for a variance, is separately addressed and described in more detail below.  (See infra, Section V.C.)

13

**A.      The Nature and Circumstances of the Offense**

Simply put, defendant used his high-ranking public position as the head of the civil division of the City Attorney's Office to criminally strongarm Kiesel into paying almost $1 million to keep concealed the collusive nature of <u>Jones v. City</u>.  Indeed, it was <u>defendant's</u> threat of serious economic and reputational harm that got Kiesel to act. With defendant's threat of potential termination and all its attendant consequences hanging over him, Kiesel was induced to pay Person A and part with that money rather than be publicly fired by the City Attorney in the closely watched <u>City v. PwC</u> case.

While it is true that defendant was not the one to initiate the extortionate demand in the first instance, once he learned of its existence, he independently joined in on it because it was in his self-interest to do so.  Specifically, he acted to protect his own career, reputation, and the City's pending lawsuits—the successes of which would bear on defendant's own professional and financial prospects.  These facts, in addition to defendant's ongoing motivation to keep concealed the unethical collusion, are aggravating and deserving of a custodial sentence.

**B.      History and Characteristics of Defendant**

As described in the PSR, defendant enjoyed a number of advantages, particularly in the way of educational and employment opportunities.  The PSR indicates that defendant had a happy (even "idyllic" childhood), enjoyed a healthy relationship with his family, and had every reasonably available opportunity to pursue a top-notch education and an elite, even enviable, legal career.  (PSR ¶¶ 77-89.)  He has had the love of a supportive spouse and a child whom they both clearly love.  As evidenced by the numerous letters that defense counsel has shared with the government, defendant continues to have the support and care of many friends, family members, and former colleagues even post-conviction--a network most defendants appearing before this Court

are not privileged enough to share.  The PSR does note that defendant has struggled with substance abuse.[8]  (Id. ¶¶ 111-116.)

Defendant's educational and employment history and support from his marriage and community may arguably reflect positively on defendant's ability to rehabilitate and live a law-abiding life as a gainfully employed member of society.  At the same time, the fact that defendant was privileged with these advantages meant not only that he knew full well the wrongfulness of his conduct, but also shows that he acted—not from economic desperation or a singular lapse in judgment—but out of a selfish desire to maintain the high-powered position, status, and reputation he enjoyed near the very top of the City Attorney's Office.

At a minimum, defendant's sentence should not improperly favor certain classes based on socioeconomic status, education, or vocational skills.  See 28 U.S.C. § 994(d) (requiring sentencing guidelines to be "entirely neutral as to ... socioeconomic status of offenders); U.S.S.G. §§ 5H1.2 ("[e]ducation and vocational skills are not ordinarily relevant in determining whether a departure is warranted"); 5H1.5 ("[e]mployment record is not ordinarily relevant in determining whether a departure is warranted"); 5H1.10 (socio-economic status is "not relevant in the determination of a sentence"); see also United States v. Prosperi, 686 F.3d 32, 47 (1st Cir. 2012) ("[I]t is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction."); United States v. Bistline, 665 F.3d 758, 760 (6th Cir. 2012) (explaining that collateral consequences "related to a defendant's humiliation before his community, neighbors, and friends would tend to support shorter sentences in cases with defendants from privileged backgrounds, who might have more to lose along

---

[8] Based on the PSR's description of defendant's more recent substance abuse and struggles with depression (PSR ¶¶ 93, 95, 114), the government supports the drug-testing and counseling-related conditions of supervised release.  (Dkt. No. 24 at 2 (Conditions 4-7.)

these lines.  And '[w]e do not believe criminals with privileged backgrounds are more entitled to leniency than those who have nothing left to lose'").

In mitigation, the government notes that defendant has a demonstrated commitment to non-profit and organizational work that long preceded his conviction. (PSR ¶¶ 90, 126.)  The government also recognizes the efforts defendant has made to positively contribute to the community since his conviction.  The PSR reports that most recently, defendant has been volunteering with two Chabad Jewish community organizations and volunteering weekly at a foodbank.  (Id. ¶ 98.)  Defendant has also taken steps to seek out mental health treatment following his offense.  (Id. ¶ 95.)  The government recognizes these as positive and productive developments by defendant, notwithstanding the difficult circumstances defendant currently finds himself.

### C.    Extensive Cooperation with the California State Bar



Coupled with the government's motion for a 3-level departure under U.S.S.G. § 5K1.1, the government recommends a low-end sentence of the adjusted Guidelines range: 18 months' imprisonment. The government respectfully submits that this sentence appropriately takes into account defendant's cooperation and other mitigation, and is a necessary and sufficient sentence to achieve the federal goals of sentencing.

### D.   General and Specific Deterrence

The strong need for general deterrence in this case supports the government's recommended sentence. Public corruption cases such as this one demand strong general deterrence. As one court noted:

> ***Unlike some criminal justice issues, the crime of public corruption can be deterred by significant penalties that hold all offenders properly accountable***. The only way to protect the public from the ongoing problem of public corruption and to promote respect for the rule of law is to impose strict penalties on all defendants who engage in such conduct, many of whom have specialized legal training or experiences. Public corruption demoralizes and unfairly stigmatizes the dedicated work of honest public servants. ***It undermines the essential confidence in our democracy and must be deterred if our country and district is ever to achieve the point where the rule of law applies to all*** — not only to the average citizen, but to all elected and appointed officials.

United States v. Spano, 411 F. Supp. 2d 923, 940 (N.D. Ill. 2006), *affirmed*, 477 F.3d 517 (7th Cir. 2006) (emphasis added). General deterrence is a particularly effective tool in corruption and other white-collar cases, as white-collar criminals often premeditate their crimes and engage in a cost-benefit analysis. See, e.g., United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."). That was certainly the case with this defendant, who deliberately and repeatedly chose to aid and abet Person A's extortion as part of his efforts to keep the collusive litigation scheme concealed.

A custodial sentence is appropriate here and will aid in achieving the critical need for general deterrence, while also rejecting the notion of a two-tier system of justice—a more flexible and lenient tier for well-heeled white-collar defendants, and a more rigid,

18

severe, and guidelines-oriented tier for "other" criminals.  See United States v. Musgrave, 761 F.3d 602, 609 (6th Cir. 2014) (central reason for sentencing guidelines was "to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes." (citation omitted)).  That dichotomy is inconsistent with the Constitution, with fundamental fairness, and with the statutory goals of sentencing, and it has been repeatedly repudiated by the courts.  See United States v. Treadwell, 593 F.3d 990, 1012–13 (9th Cir. 2010) (overruled on other grounds) (rejecting the principle that a defendant of means should be afforded a lower prison sentence to enable him to pay restitution to his fraud victims, and noting the critical importance of "the minimization of discrepancies between white- and blue-collar offenses, and limits on the ability of those with money or earning potential to buy their way out of jail" (citation omitted)); United States v. Stefonek, 179 F.3d 1030, 1038 (7th Cir. 1999) (White-collar criminals are "not to be treated more leniently than members of the 'criminal class'").  A meaningful sentence in this closely watched public corruption case will thus serve an important public purpose.

This case also reflects some need for specific deterrence.  Defendant may seek the reinstatement of his license and, even if not, will likely find work in some adjacent capacity, given his age, the relatively short period of imprisonment he likely faces, and his years-long professional ambitions that he relentlessly pursued, which ultimately drove him to commit the present offense when push came to shove.

**E.     Need to Reflect Seriousness of Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense**

A custodial sentence is also necessary to reflect the serious nature of defendant's crime, punish defendant's conduct, promote respect for the law, and restore public faith in the system.  As one court has observed: "The judicial response to demonstrated corruption by the political elite and the lapse of duty, honor, and integrity it represents is as important as the corruption itself."  United States v. Morgan, 635 F. App'x 423, 447 (10th Cir. 2015).  Here, the appropriate judicial response to defendant's serious conduct,

1   motivated by his own self-interest, preservation, and professional ambition, warrants a
2   meaningful custodial sentence like the one the government recommends.

3         **F.   Avoidance of Sentencing Disparities**

4         The Court is also to consider the need to avoid unwarranted sentence disparities
5   among defendants with similar records who have been found guilty of similar conduct.
6   18 U.S.C. § 3553(a)(6).  Although distinguishable in certain respects, defendant's
7   conduct--like the crimes of the other defendants who have been sentenced in related
8   cases before this Court--is aggravating and reflects a serious breach of the public trust.
9   Importantly, defendant's fulsome acceptance of responsibility and substantial
10  cooperation with the government and State Bar distinguish his case from others, thereby
11  limiting the utility in comparison with those sentences.  The government submits that
12  defendant is not similarly situated to David Wright or David Alexander, who were also
13  sentenced by this Court.  Rather, applying the government's recommended collective 7-
14  level downward departure and variance and then sentencing defendant within the
15  resulting Guidelines range will aid in avoiding unwarranted sentencing disparities.

16        **G.   Fine**

17        Based on a total offense level of 22, the PSR initially calculated defendant's fine
18  range as $15,000-$150,000.  (PSR ¶ 142); U.S.S.G. § 5E1.2(c)(3).  The PSR further
19  found that defendant had significant assets and a net worth of approximately ██████.
20  (Id. ¶¶ 130, 142.)  Defendant has an 11-year-old dependent.  (Id. ¶ 92.)

21        Based on the government's recommended 7-level departure and resulting total
22  offense level of 15, the fine range should be **$7,500 to $75,000**.  U.S.S.G. § 5E1.2(c)(3).
23  The government recommends a mid-range fine of **$35,000**, in light of the serious nature
24  and scope of the offense conduct, the personal motivations for defendant's crime, and the
25  USPO's supported finding that defendant had a net worth of ██████, counterbalanced
26  by the fact of defendant's dependent and that a substantial amount of defendant's assets
27  are attributable to his spouse; earmarked for their dependent; or tied up in the family
28  home where defendant's spouse and dependent reside.

## VI.  CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court impose the following sentence: (1) 18 months' imprisonment; (2) a three-year term of supervised release; (3) a $35,000 fine; and (4) a special assessment of $100.